**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF GEORGIA**
**COLUMBUS DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| STALWART PLASTICS, INC. | ) | CASE NO. 24-40194 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| TRUIST BANK and | ) | |
| TRUIST EQUIPMENT FINANCE CORP., | ) | |
| | ) | |
| Movants, | ) | |
| | ) | |
| v. | ) | CONTESTED MATTER |
| | ) | |
| STALWART PLASTICS, INC. | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

**MOTION TO CONVERT CASE TO CHAPTER 7, OR**
**IN THE ALTERNATIVE TO APPOINT A CHAPTER 11 TRUSTEE**
**PURSUANT TO 11 U.S.C. §§ 1104(A) and 1112(B), AND APPLICABLE LAW**

Truist Bank ("Truist") and Trust Equipment Finance Corp. ("TEFC," and collectively with Truist, the "Movants"), by and through their undersigned counsel, and pursuant to 11 U.S.C. §§ 1104(a) and 1112(b) and applicable law, hereby move to convert this Chapter 11 case to a case under Chapter 7 of the Bankruptcy Code, or in the alternative for the appointment of a Chapter 11 trustee to manage the business and assets of the bankruptcy estate of the above-captioned Debtor (the "Motion"), and for their Motion, Movants respectfully state as follows:

**INTRODUCTION**

1.      Stalwart Plastics, Inc. (the "Debtor") has defaulted on three commercial loans made to it by Movants, two of which have matured, and a corporate credit card account. The Debtor owes Movants *more than $26 million* in principal, interest, fees, and other amounts that Movants

1

are entitled to under the applicable Loan Documents (defined below). With this sizeable debt looming, the Debtor has denied Movants access to their Collateral, refused Movants' ability to exercise their contractual right for an independent financial field examination, delayed and partially denied Movants' exercise of its contractual right to appraise its Collateral, failed to provide key information, and admitted that the Debtor has submitted fraudulent financial statements to Movants related to the subject loans.  Notwithstanding the Debtor's efforts to thwart Movants' diligence, Movants have discovered that the fraud to which the Debtor *admits* barely scratches the surface of the systematic, years' long bank fraud committed by the Debtor's principals against numerous lending institutions, including Movants, in the names of affiliated entities they own and/or control.  Further, the Debtor's dire cash situation and its own cash collateral motion and accompanying budget demonstrate that the Debtor is losing money even without paying debt service on the over $26 million on loans owed to Movant.

2.      Cause exists to convert this Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code because there is substantial or continuing loss to or diminution of the estate and the complete absence of a reasonable likelihood of rehabilitation.

3.      In the alternative, cause exists to appoint a neutral Chapter 11 trustee to protect and preserve the Debtor's business operations and the Debtor's bankruptcy estate for the benefit of all creditors and parties in interest, and to investigate the scope of the Debtor's fraud and the bona fides of the Debtor's pre-bankruptcy filing conduct and transactions.  The appointment of a Chapter 11 trustee is in the best interests of Debtor's creditors and all parties in interest in this Bankruptcy Case because the Debtor's management team is conflicted and lacks the moral authority to continue to act as a fiduciary of the Debtor's bankruptcy estate, there is little, if any,

4856-4829-6627.v3

prospect of a reorganization, and the harm of Debtor's continued management outweighs any expense that the appointment of a trustee would cause the bankruptcy estate to incur.

## FACTUAL BACKGROUND

**A.  General Background.**

4.       On March 29, 2024 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") initiating the above-captioned bankruptcy case (Case No. 24-40194) (the "Bankruptcy Case").

5.       The Debtor is currently operating its business as debtor and debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

6.       The Debtor manufactures stretch plastic film out of its plant in Midland, Georgia, which is leased to it by its affiliate, Quantico Plastics Group, Inc. ("Quantico"),  That property is subject to a security deed in favor of Sunflower Bank.

**B.  Movants' Secured Loans to the Debtor.**

7.       The Debtor is the borrower on three commercial loans issued by Movants: (i) a revolving line of credit in the amount of $12 million, which is maxed out (the "Revolver"); (ii) a $7.5 million delayed draw equipment finance loan for the manufacture and acquisition of an extrusion manufacturing line known as "Line 3" (the "TEFC Loan"); and (iii) a delayed draw term loan for the manufacture and acquisition of an extrusion manufacturing line known as "Line 4" (the "DDTL Loan"; together with the Revolver and the TEFC Loan, the "Loans").  True and correct copies of the loan documents and perfection documents for the Loans are attached to this Motion as **Exhibits A-D (Revolver), Exhibits E-H (TEFC Loan),** and **Exhibits I-K (DDTL Loan)** (collectively, the "Loan Documents").

8.      Movants each have perfected, blanket security interests in substantially all of the Debtor's assets, including its accounts, inventory, furniture, fixtures and equipment, goods, deposit accounts, books and records, instruments, accounts receivable, and intangible property (the "Collateral"). Moreover, the Loan Documents provide Movants with significant and important rights, including, but not limited to, the right to inspect the Collateral at any reasonable time, the right to obtain appraisals whenever deemed necessary in their sole discretion, and the right to access, inspect, and examine the Debtor's books and records.

9.      The Loans are guaranteed by the Debtor's parent company, Fruma Plastics SA de CV ("Fruma"), a Mexican business entity with is principal place of business at 116 Prol Corregidora Nte, 76140 Queretaro Queretaro Mexico.

10.     As of the Petition Date, the Revolver and the TEFC Loan had matured by their express terms,[1] and as of the Petition Date, the Debtor was in default of those loans because it had failed to repay in full the aggregate outstanding balance of the principal and interest due thereunder.  As of the Petition Date, the Debtor was also in default of the DDTL Loan because it had failed to make the interest-only payments and commence the principal installment payments under the terms of the DDTL loan documents, as well as by virtue of its cross-defaults under the terms of the Loan Documents for the Revolver and the TEFC Loan.  Additionally, the Debtor owes more than $700,000 on its corporate credit card with Truist, and has failed to make payments thereon since January 2024.

---

[1]      The Revolver matured by its express terms on April 30, 2023, and Truist extended the maturity date on a month-to-month basis through October 19, 2023.  The TEFC Loan matured by its terms on March 31, 2022, but was extended by amendment to August 21, 2023.

4856-4829-6627.v3

**C.  Debtor's Fraud, Dishonesty, and Gross Mismanagement.**

    (i)    *Movants' Discover Disturbing Allegations of Bank Fraud Involving Debtor's Principals*

11.    In October 2023, Truist was conducting due diligence in connection with underwriting a potential renewal of the Revolver when a bank manager discovered that the Debtor's CEO, Amalia C. Contreras ("Contreras"), and her son, Miguel Luna ("Luna"), the Debtor's Vice President of Operations, were both named defendants in litigation pending in Arizona styled as *UniCredit Bank Austria AG v. Immobiliaria y Arrendadora Cuadro S.A. de C.V.*, *et al.*, Case No. 2:23-cv-01991 (filed Sept. 21, 2023) (the "Arizona Litigation").  In the Arizona Litigation, the plaintiff bank alleged that it secured an arbitration award against Immobiliaria y Arrendadora Cuardo S.A. de C.V. ("Immobiliaria") arising out of a loan in default, and that Contreras and Luna absconded with Immobiliaria's property and equipment, leaving its manufacturing facility empty, and removing those assets from the bank's reach.  The plaintiff bank also identified four other banks who were allegedly defrauded out of approximately $20 million by other stretch film manufacturing businesses owned, operated, and/or controlled by Contreras, Luna, and/or the Debtor's current sole Director, Jose Montes ("Montes").

    (ii)    *The Debtor Submitted Fraudulent Invoices to Justify Loan Draws*

12.    Learning of the allegations set forth in the Arizona Litigation complaint and the past judgments detailed therein, Movants began making inquiries of the Debtor and scrutinizing documents previously provided to them by the Debtor.  One of those set of documents were the invoices that the Debtor submitted from Mexico-based Empaques Poliplasticos, the alleged manufacturer of Line 3, to substantiate drawdown requests on the TEFC Loan.  Movants' review of those invoices reflected that:

- The company Empaques Poliplasticos does not appear to exist, and it has no website. There is a website for a company called Empaques Plasticos de Mexico, S.A. de C.V., *not* Poliplasticos.

- The Empaques Plasticos website identifies it as a manufacturer of stretch film—like Stalwart—*not* a manufacturer of the extrusion equipment used to manufacture such film.

- The address on the invoices for Empaques Poliplasticos does not match the address on the Empaques Plasticos website.

- The Google Maps result for the address on the Empaques Poliplasticos invoice does not identify as belonging to any business bearing a name similar to Empaques.

- The QR Codes on the invoices are not functional.

- The majority of the invoices bore the same Invoice Number of #5937 even though they were allegedly issued at different points in time during the manufacturing process.

- Several invoices bore the same date of *October 7, 2021* even though they were allegedly issued at different points in time during the manufacturing process.

- The initial invoice identified the equipment's specifications and pieces with an identifier of "SML" in the part code description and the order confirmation cover page states that the line being purchased is a "SmartCast" coextrusion castfilm line.  SmartCast, however, is a copyrighted brand of a company called SML based out of Austria, *not* Empaques Plasticos.  Moreover, SML is named as the manufacturer of the equipment at issue in the Arizona Litigation discussed above.[2]

- The invoices lack payment due dates; and

- The wiring instructions on the invoices change from invoice to invoice, and to various banks located in New York, not Mexico.

Shortly after these discoveries, Movants sent reservation of rights letters to the Debtor, notifying

the Debtor of its defaults under the Revolver and the TEFC Loan.

---

[2]   It appears that Lines 3 and 4 were *not* manufactured by Empaques Poliplasticos *or* SML. Line 3 was manufactured by Colines S.p.A. in Italy, and Movants have no documentary or tangible evidence that Line 4 even exists, despite requesting such evidence from the Debtor for months.

4856-4829-6627.v3

(iii)    *Hilco Report, Movants' Shrinking Collateral Package, and the Debtor's Misrepresentations Related to the Manufacturer of the Debtor's Equipment*

13.    In November 2023, the Movants engaged an independent appraiser, Hilco, to visit the Debtor's facility.  Hilco's inventory report did not readily match the itemized collateral schedules that the Debtor had submitted to the Movants in connection with its drawdown requests under the TEFC Loan or the information Movants had on hand.  The Movants learned, among other things, that Empaques Poliplasticos was *not*—as the Debtor had repeatedly represented, including in the invoices used to substantiate its drawdown requests—the actual manufacturer of Line 3, and that this equipment was instead, Colines equipment from Italy.

14.    Additionally, in connection with the Hilco inventory, the Debtor claimed, for the first time, that its equipment known as Line 2, which Movants believed was part of their collateral package based on the Debtor's financial reporting, among other things, was owned by an affiliate, Zummit Plastics, Inc. ("Zummit"), and *leased* to the Debtor.  Movants have repeatedly asked the Debtor to provide evidence of this leasing relationship, including a written lease agreement, but the Debtor has failed and refused to do so.  Notably, as an affiliate of the Debtor's, Zummit is directly or indirectly owned, operated, and/or controlled by Contreras, Luna, and/or Montes,[3] and as discussed below, Zummit recently filed a voluntary Chapter 7 bankruptcy in Arizona.

15.    Concerned with the apparently changing scope of their Collateral, the Movants also began inquiring about the progress and estimated completion date of Line 4, payments on Line 4,

---

[3]    Zummit's schedules and statement of financial affairs indicate that Montes was Director and President of the Board of Zummit at the time of filing.  *See* Docket No. 22 in Zummit bankruptcy case.  Further, the corporate ownership statement in Zummit's schedules and statement of financial affairs indicates that the Debtor's parent, Fruma, owns 10% or more of Zummit.  *Id.* Upon information and belief, Fruma is 95% owned by Luna's mother, Contreras, and the remaining 5% is owned by Montes, the current sole Director of the Debtor and the Director of Zummit.

and any outstanding balance owed to the manufacturer.  However, to date, the Debtor has only represented orally that Line 4 was approximately 80% complete, and has failed to provide *any* documentation or additional information regarding Line 4 or its status and has even refused to provide Movants with information to enable them to contact the manufacturer directly.  At best, the Debtor misrepresented the identity of the manufacturer of Lines 3 and 4, and, at worst, the Debtor has completely fabricated the existence of Line 4 and has fraudulently obtained and used funds for the purported "acquisition" of Lines 3 and 4.

16.    After Hilco prepared the inventory report, Movants asked to appraise their Collateral.  For several months, the Debtor absolutely refused to cooperate, and stonewalled Movants' requests to obtain information regarding the Collateral and the Debtor's solvency.  Indeed, the Debtor denied Movants the right to complete their appraisal from November 2023 through early March 2024 (further discussed below).

*(iv)    Material and Negative Inaccuracies in the Debtor's Financial Statements, Debtor's Admission of Fraud, and Questionable Transfers*

17.    On November 28, 2023, Movants met with Luna and the Debtor's then CFO, Jose Truchuelo ("Truchuelo"), and notified them that Movants were no longer interested in financing the Debtors' operations, but indicated they may be willing to consider a short-term forbearance agreement if the Debtor would cooperate and provide Movants with customary information regarding their Collateral.  Despite the reasonableness of Movants' conditions— which Movants were already contractually entitled to—the Debtor provided incomplete and piecemeal information.  Because the Debtor ultimately failed and refused to fully comply with Movants requests, and given the issues outlined above and the information that it did provide (discussed immediately below), the parties never agreed to a forbearance agreement.

18.     On December 15, 2023, the Debtor finally sent Movants its balance sheets and income statements for September, October, and November 2023.  However, those documents only raised more questions and reflected a financial condition that was *materially worse* than the Debtor had previously conveyed to Movants.  For example, in June 2023, the Debtor had reported its year-to-date net income before taxes was $3,026,011.80.  Yet, on its September 2023 statement, the Debtor reported year-to-date net income before taxes of ($6,837,218.84), a negative variance of *more than $9 million*.  Further, the year-to-date total *gross* income in September was amazingly *less* than the year-to-date total gross income reported through June of the same year, and the financial reporting also for the first time contained an "Accruals" line, reported at ($5,684,598,26) through September.  In response to these troubling restatements, Movants demanded answers and insisted on an independent field examination of their Collateral and the Debtor's books and records.  In late November/early December, the field examiner requested financial documents and underlying support to commence the exam.  However, the Debtor failed and refused to comply, and the examination was unable to proceed.

19.     On January 12, 2024, Movants in writing demanded: (i) to inspect the Debtor's books and records pursuant to its inspection rights, (ii) specific financial documents, (iii) documents regarding the status of the completion and delivery of Line 4, (iv) a copy of the alleged "lease" between Zummit and the Debtor related to Line 2, (v) access to and an appraisal of the Collateral, and (vi) that the Debtor instruct all customers to pay all outstanding accounts receivable (also Movants' Collateral) into the Debtor's deposit account at Truist, consistent with the parties' loan documents, all no later than January 26, 2024.  However, except for providing

limited bank statements in early March (but only after repeated requests),[4] the Debtor has failed to comply with these requests.

20.    Shortly after Movants' demands, the Debtor advised Movants that it had fired Truchuelo, claiming that he had embezzled millions from the Debtor.  Blaming Truchuelo, the Debtor also *admitted* that the financial and collateral reporting that the Debtor had provided to Movants prior to then was false.  Movants have since learned, from the Zummit Chapter 7 Trustee and Angelina Valero, the new Zummit/Debtor CFO ("Valero"), that Truchuelo misappropriated funds from both Zummit and the Debtor, and has done so since *at least February 2022*, diverting millions from both entities into personal cryptocurrency holdings.  Further, according to Valero's testimony from the Section 341 hearing in the Zummit bankruptcy, *Contreras and/or Luna knew of Truchuelo's alleged embezzlement* from Zummit since October 2023, *at the latest*, but inexplicably allowed him to continue to communicate with and make representations to Movants regarding the Debtor's financial condition.  Moreover, the Debtor only terminated Truchuelo after Movants demanded access to the Debtor's books and records.  Although the Debtor has cast Truchuelo as its scapegoat, the Debtor charged an additional $209,519.46 to its corporate credit card above its $500,000 limit *after* firing Truchuelo, and further, as reflected in the Chase bank statements, the Debtor continued to divert substantial amounts of cash to insiders, affiliates, and unknown recipients after Truchuelo's termination.[5]

---

[4]    The bank statements the Debtor ultimately provided again only raised more questions. They reflected multiple large and suspicious transfers between August 2023 and February 2024 from non-Truist bank accounts to insiders and/or affiliates and various unknown recipients, totaling in the seven figures.  These bank statements included statements for bank accounts with Chase Manhattan Bank, which were apparently opened and funded in January and February 2024, in direct contravention of Movants' demand that the Debtor comply with its contractual obligation to direct funds into Truist deposit accounts.

[5]    The Debtor was able to charge above its limit because its January 22, 2014 "payment" against the card's balance ultimately bounced.

21.     Thereafter, the Debtor used Truchuelo's misconduct as another excuse to deprive the Movants of information.  Among other things, the Debtor denied Movants' request for updated financial statements and Collateral financial reports, including a current borrowing base report, A/R aging reports, and inventory reports.  However, more than a month after purportedly hiring a financial advisor, Richard Gaudet ("Gaudet"), the Debtor still has not produced new or corrected financials to Movants.  The Debtor officially responded to Movants' above-referenced January 12, 2024, demand by stating that it was not "in a position to comply with the document deadlines and other deadlines" of Movants.  And, the Debtor failed and refused to grant Movants any access throughout January and February 2024.

(v)     *Debtor's Affiliate Files Bankruptcy Unveiling Inaccuracies, Troubling Connections, and Contradictions*

22.     On February 1, 2024, Zummit filed a voluntary bankruptcy pursuant to Chapter 7 of the Bankruptcy Code after one of its creditors sued and requested the appointment of a receiver. *See In re Zummit*, Case No. 2:24-bk-00816-BKM (Bankr. D. Ariz.); *Umpqua Bank v. Zummit Plastics, Inc., et al.*, Case No. CV2024-001192 (Ariz. Super Ct., filed Jan. 22, 2024). Notably, notwithstanding the fact that Valero was the then acting CFO of Zummit and Montes remains the President of the Zummit Board, Zummit did *not* identify any lease with the Debtor as either an unexpired lease or an executory contract in its bankruptcy schedules and statements of financial affairs, an omission that directly contradicts the Debtor's representations to Movants regarding the ownership of Line 2.  Further, according to Zummit's May 26, 2023, security agreement signed in favor of Umpqua Bank, Zummit represented and warranted that *none* of its equipment was leased by or to any third party.  Additionally, the Debtor's claim that it does not own Line 2, and that it is instead owned by Zummit, is inconsistent with the Debtor's Collateral

11

schedules and with its December 1, 2023, Information Certificate, which identifies no material transactions with any affiliates.

23.     Zummit's bankruptcy schedules also identify the Debtor as an unsecured creditor holding an enormous, $2.77 million claim.  *See* Docket No. 22 in Zummit bankruptcy case. According to the testimony of Valero at Zummit's Section 341 meeting of creditors, this claim relates to plastic the Debtor delivered to or on behalf of Zummit as far back as 2022, but for which Zummit *never* paid the Debtor.  Further, the bank statements that the Debtor provided to Movants in March 2024 reflect several substantial transfers to Zummit (at a time where Zummit apparently owed the Debtor millions).  The Debtor fraudulently omitted this debt owed by its affiliate Zummit in its accounts receivable and borrowing base reports that it submitted to the Movants.

     *(vi)     Movants' Onsite Appraisal, Luna's Deceitful and Incompetent Conduct, and Evidence of Continuing Fraud by Debtor's Management Team*

24.     On March 5, 2024, after weeks of oral and written requests, the Debtor finally allowed Movants' appraiser to visit its facility to appraise the Collateral.  However, the Debtor controlled and limited the appraiser's access, including by first attempting to limit the length of the appraisal, and then insisting that Luna (who runs or ran operations for both Zummit and the Debtor) accompany the appraiser for the duration of his visit.  Despite the Debtor's claims that an appraiser's presence would disrupt its business operations, the appraiser, Gary Anderson of Plastics One Access Advisors ("Anderson"), observed that the Debtor was *not* fully operational, and that at best, it was running at minimum capacity on only one manufacturing line.

25.     During the appraisal, Luna prohibited Anderson from inspecting, viewing, accessing, or appraising Line 2, and threatened that if Anderson even "approached" Line 2, he would be asked to leave the Debtor's facility.  Luna even went as far as to refuse Anderson's reasonable request to simply confirm the make and model of the Line 2 equipment, which was

12

sequestered inside the Debtor's facility and was not operating.  Luna nonsensically claimed it was unnecessary for Anderson to inspect Line 2 because Bank of America had a lien on the equipment and the bank would be removing it within the next sixty (60) days.[6]  More alarming, the Debtor unreasonably and irrationally denied Movants the most basic access to even begin to verify the veracity of these new contentions.  Indeed, if what Luna proclaimed during the appraisal was accurate, there is no legitimate business reason to deny Movants' appraiser the ability to confirm the make and model of the line.

26.     Luna likewise prohibited Anderson from inspecting, viewing, or appraising another portion of Movants' Collateral, four rewinders, which were also sequestered from the main facility and were not operating.  Luna did not assert—as he did with Line 2—that another bank has liens on the rewinders.  Yet, Luna inexplicably deprived Movants' appraiser the ability to inspect and appraise them.

27.     Luna also prohibited Anderson from accurately measuring, evaluating, inspecting, and appraising the Debtor's inventory—raw materials or resin—which is Movants' Collateral. Specifically, Luna forbade Anderson from accessing the silos and railcars where the inventory is stored, and Luna failed and refused to supply Anderson with a perpetual inventory report showing the types of resins on hand, costs per pound, pounds on hand, and location of the inventory.  This type of report is essential to the operations of a plastics business, and any plastics manufacturing business should be able to produce such a report on demand in the ordinary course of business. Despite multiple requests and promises by Luna, Luna failed to provide any form of such a report until eight days *after* Anderson's visit.

---

[6]     The existence of Bank of America's purported lien and its intent to remove such collateral from the Debtor's facility was also confirmed by Valero's testimony at Zummit's Section 341 meeting of creditors.

28.     The report that Luna did provide, which was presumably reviewed by Valero and/or Gaudet, was unusual, incomplete, practically useless, and grossly overstated the Debtor's inventory.  For example, the report failed to identify the Debtor's costs per pound even though Anderson specifically requested that information.  Additionally, the inventory report that Luna provided purported to be "as of" March 7, 2024, but it disclosed that the last rail car *was delivered on February 27, 2024.*  This is particularly suspicious because a business like the Debtor's should typically utilize 40,000 pounds per day for *each* operating line, and therefore cannot possibly rely on a report containing weeks' old information.  Finally, the report claimed the Debtor had *more than 9.5 million pounds of resin* on hand.  However, that volume of material would fill at least forty rail cars and, during his visit, Anderson only observed six rail cars onsite and he was not allowed to verify their contents, and Luna reported there were two rail cars on the spur near the facility.  Eight rail cars *could not possibly hold 9.5 million pounds of resin*, and thus it appears the Debtor's report—sent begrudgingly and after unreasonable delay—is objectively *false*.

29.     After piecing the foregoing together, on March 21, 2024, Movants filed a Verified Complaint and an Emergency Application in the District Court for the Middle District of Georgia seeking the immediate appointment of a receiver to manage the Debtor and its assets for the benefit of creditors.  *See* Case No. 4:24-cv-00037-CDL.  Ultimately, the Debtor consented to the entry of an order appointing the requested receiver if it failed to file bankruptcy in this Court on or before March 29, 2024.

30.     On March 28, 2024, in a transparent attempt to distance the Debtor from the taint of Luna's egregious conduct, counsel for the Debtor, Valero, and Gaudet advised counsel for Movants and Movants' financial advisor that March 29, 2024, would be Luna's last day as an officer or manager of the Debtor, and that going forward the Debtor would be managed by Valero

14

as CFO, Gaudet as CRO, and Montes as the sole Director of the Debtor.  During that conversation

the Debtor's team indicated that Luna would still be involved with the Debtor's operations as a

"consultant".   During those discussions and subsequent discussions since the Petition Date,

Movants have also learned that Quantico is in default under its loan agreements with Sunflower

Bank (which are guaranteed by the Debtor), and that Sunflower Bank has accelerated or at any

time could accelerate that indebtedness and foreclose on the Debtor's leased facility.

31.     The Debtor's bankruptcy petition is signed by Valero as the CFO of the Debtor,

and the resolution authorizing the Debtor's bankruptcy filing, which is dated March 22, 2024, is

signed by Montes as the Debtor's sole Director, and identifies Luna, Montes, and Valero as the

Debtor's authorized representatives.  *See* Docket No. 1.  Notably, Gaudet was *not* identified as an

authorized representative in the authorizing resolution.  *Id.*

> (vii)   *The Debtor's Cash Collateral Motion Demonstrates this Bankruptcy Case is a*
> *Fait Accompli, and that the Debtor is Burning Cash and has No Going Concern*
> *Value*

32.     On April 1, 2024, the Debtor filed a Cash Collateral Motion and an accompanying

13-week cash collateral budget attached as Exhibit A [Docket No. 5] (the "Cash Collateral

Motion"), which seeks to use Movants' cash collateral on an interim and then final basis to operate

in Chapter 11, essentially providing Movants with no adequate protection other than the promise

to operate as a "going concern."

33.     However, the Cash Collateral Motion demonstrates that this Debtor apparently had

dissipated nearly *all* of its cash prior to its bankruptcy case, filing bankruptcy with only about

$8,000 on-hand.  Meanwhile, over the next 13-weeks, the Debtor's own proposed budget projects

a diminution in the value of Movants' collateral (cash and inventory) by over $476,000 in a mere

13-weeks *without paying any debt service* on the Debtor's $26 million secured debt to Movants.[7]

34.     Moreover, even that budget has been prepared apparently without the benefit of any

valid historical information because of the fraud to which the Debtor *admits*.   Thus, these

projections were developed based on what the Debtor hopes to occur and not based on any actual

evidence that the plant can operate profitably.  Additionally, if the Debtor can implement a number

of process improvements, they will generate only limited cash over the next 13-weeks.   In

summary, the Debtor will need to implement process improvements over the next 13-weeks and

during that timeframe they will generate very little cash and reduce the value of the collateral by

over hundreds of thousands of dollars with no liquidity event scheduled after the initial 13-weeks.

Based on the current run rate, the Debtor would need to operate for nearly two years or more to

recover the loss in collateral value in the first 13 weeks.

## LEGAL BASIS FOR REQUESTED RELIEF

### A.  The Court Should Convert this Chapter 11 Case to a Case Under Chapter 7 of the Bankruptcy Code.

35.     Section 1112(b)(1) of the Bankruptcy Code, in pertinent part, provides as follows:

"[T]he court *shall convert* a case under this chapter to a case under chapter 7 . . . for cause unless

the court determines that appointment under section 1104(a) of a trustee or an examiner is in the

best interest of creditors and the estate."  11 U.S.C. § 1112(b)(1) (emphasis added).

36.     Section 1112(b)(4) further provides that for purposes of conversion under 1112(b),

"cause" includes:

---

[7]     The Debtor has circulated to counsel for Truist a slightly revised budget, omitting *any* rent being paid to its affiliate Quantico for its Georgia facility (at least for an interim period). Even without any of that rent, however, the diminution in the Bank's collateral is still several hundred thousand dollars over just 13 weeks.

4856-4829-6627.v3

**A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;**

(B) gross mismanagement of the estate;

(C) failure to maintain appropriate insurance that poses a risk to the estate or to the public;

(D) unauthorized use of cash collateral substantially harmful to 1 or more creditors;

(E) failure to comply with an order of the court;

(F) unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter;

(G) failure to attend the meeting of creditors convened under section 341(a) or an examination ordered under rule 2004 of the Federal Rules of Bankruptcy Procedure without good cause shown by the debtor;

(H) failure timely to provide information or attend meetings reasonably requested by the United States trustee (or the bankruptcy administrator, if any);

(I) failure timely to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief;

(J) failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court;

(K) failure to pay any fees or charges required under chapter 123 of title 28;

(L) revocation of an order of confirmation under section 1144;

(M) inability to effectuate substantial consummation of a confirmed plan;

(N) material default by the debtor with respect to a confirmed plan;

(O) termination of a confirmed plan by reason of the occurrence of a condition specified in the plan; and

(P failure of the debtor to pay any domestic support obligation that first becomes payable after the date of the filing of the petition.

*See* 11 U.S.C. § 1112(b)(4) (emphasis added).

37.     Conversion is clearly appropriate in this Bankruptcy Case because there is substantial and/or continuing loss to or diminution of the estate and there is an absence of any reasonable likelihood of rehabilitation.   As set forth above, the Cash Collateral Motion demonstrates that this Debtor (which is far from fully operational) dissipated nearly *all* of its cash prior to this Bankruptcy Case, filing bankruptcy with only about $8,000 on-hand.  If that wasn't enough to demonstrate the hopelessness of this Bankruptcy Case in Chapter 11, over the next 13-

17

weeks, the proposed budget seeks to gamble with Movant's remaining collateral – projecting a *diminution in value* of that collateral (cash and inventory) by *hundreds of thousands of dollars* in a mere 13-weeks.  To make matters worse, this loss is projected to occur without the Debtor making *any debt service* on the Debtor's $26 million secured debt to Movants.  Further, the Debtor's proposed budget has not even budgeted for other material anticipated Chapter 11 expenses such as professional fees for an official committee of unsecured creditors.[8]  Finally, the Debtor faces the real possibility of losing its ability to operate altogether in the event that Sunflower Bank forecloses on the Debtor's leased operating facility, which is owned by Quantico, leased to the Debtor, and is set to expire in the foreseeable future.

38.     These facts clearly demonstrate that the Debtor is *not* a going concern, and has no reasonable prospect of reorganizing.  Thus, the administration of this Bankruptcy Case will be more effective and more efficient under Chapter 7 as the continuing diminution of Debtor's estate makes reorganization wholly unrealistic.   In short, there is no reasonable likelihood of rehabilitation.  Moreover, the elimination of certain expenses unique to Chapter 11, such as (i) U.S. Trustee fees, (ii) professional fees for a creditors' committee, and (iii) expenses related to the filing of monthly financial reports, should minimize expenses and ensure a maximum recovery to the Debtor's estate.  Finally, as discussed both above and below, this bankruptcy estate desperately needs a fiduciary with a fresh set of eyes to examine and prosecute the litany of claims tha likely exist against various insiders and affiliates of the Debtor.  Accordingly, it is in the best interests of Debtor's creditors and the Debtor's bankruptcy estate that this Court convert this Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code.

---

[8]     The continuing losses are consistent with the most recent financial statements received from the Debtor by Movants, as discussed in paragraph 18 above.  As set forth in the text, on its September 2023 statement, the Debtor reported a year-to-date loss of *over $6 million*,

**B.  In the Alternative, the Court Should Appoint a Chapter 11 Trustee.**

39.     If the Court determines that it is not in the best interests of creditors to convert this Bankruptcy Case to Chapter 7, Movants respectfully request the appointment of a Chapter 11 trustee.  Section 1104(a)(1) of the Bankruptcy Code provides that the Court *shall* order the appointment of a Chapter 11 trustee "for *cause*, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either *before* or after the commencement of the case." (emphasis added).  In addition, Section 1104(a)(2) of the Bankruptcy Code also provides that the Court *shall* order the appointment of a Chapter 11 trustee "if such appointment is *in the interest of creditors, any equity security holders, and other interests of the estate* without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor."  (emphasis added)

40.     This Court has held that in the context of a motion to appoint a trustee the movant has the burden of proof, and "[a]bsent a showing of need for the appointment of a trustee, there is a strong presumption that the debtor should be permitted to remain in possession."  *In re Prestressed Concrete Co.*, 61 B.R. 432, 439 (Bankr. M.D. Ga. 1986) (denying appointment of trustee where movant failed to present *any* evidence of cause).  "Nevertheless in the appropriate case, the appointment of a trustee is a power which *is critical for the Court to exercise in order to preserve the integrity of the bankruptcy process* and to insure that the interests of creditors are served."  *In re Intercat, Inc.*, 247 B.R. 911, 920 (Bankr. S.D. Ga. 2000) (emphasis added).

41.     The Court has discretion when determining whether "cause" exists pursuant to Section 1104(a)(1) and whether the appointment is in the best interests of creditors under Section 1104(a)(2). *See In re Sharon Steel Corp.*, 871 F.2d 1217, 1226 (3d Cir. 1989). However, once the court determines that cause exists or that appointment of a trustee is in the best

interests of the relevant parties, the court *shall* appoint a trustee, and it has no discretion. *See In re Oklahoma Refining Co.*, 838 F.2d 1133 (10th Cir. 1988).

### 1. Cause Exists to Appoint a Chapter 11 Trustee.

42.    The list of examples of cause provided under Section 1104(a)(1) is not an exhaustive list, and in addition to fraud, dishonesty, incompetence or gross mismanagement, examples of cause to appoint a trustee also include: (i) the materiality of the misconduct, (ii) treating insiders or affiliated entities differently than other creditors or customers, (iii) the existence of pre-petition voidable preferences or fraudulent transfers, (iv) unwillingness or inability of management to pursue estate causes of action, (v) conflicts of interest on the part of management interfering with its ability to fulfill fiduciary duties to the debtor, (vi) self-dealing by management, and (vii) waste or squandering of corporate assets. *Intercat*, 247 at 921 (citation omitted).  Multiple factors demonstrate that cause clearly exists to appoint a Chapter 11 trustee in this Bankruptcy Case.

43.    First, numerous examples of fraud or indicia of fraud are present.  In addition to the fact that the Debtor has admitted that its former CFO provided Movants with fraudulent financial statements, on which Movants relied in extending credit, the Debtor has demonstrably lied and/or misrepresented the identity of the manufacturer of one or more of its equipment lines, obtained funding based on false pretenses for another equipment line that does not appear to exist, submitted fraudulent accounts receivables reports, and as recently as within the last few weeks, when Valero and Gaudet were both involved with the Debtor, submitted a false inventory report to Movants. Further, the Debtor's unwillingness to: (i) cooperate with Movants and their agents at every turn and even prevent Movants' appraiser from viewing all of Movants' Collateral, (ii) provide contact

information for its actual equipment manufacturer, or (iii) even attempt to substantiate the Debtor's
alleged equipment "lease" with Zummit, all smack of deceit and are blatantly dishonest.

44.     Second, the Debtor's management team's failure to remove Truchuelo, or at a
minimum remove his access to the Debtor's cash, for *months* after they knew that he had been
committing widespread and material fraud for his own personal gain is at best wantonly
incompetent, and should be more appropriately characterized for what it is, at best—gross
mismanagement.  Debtor's management team's gross mismanagement is further demonstrated by
the fact that it has failed to maintain an accurate perpetual inventory report of its inventory, which
is essential to running a plastics manufacturing business.

45.     Third, the questionable conduct outlined herein was incredibly material as it
induced Movants into loaning the Debtor millions of dollars on a secured basis when it did not
actually have the collateral package to support the size of the subject loans.  Debtor's management
team's fraud and misconduct is exacerbated by the fact that they are hopelessly conflicted from
acting as a fiduciary in this Bankruptcy Case as a result of their role on both sides of multiple
known and dubious transactions with affiliates, insiders, and related parties, including the alleged
Zummit "lease" and the Debtor's claims in that bankruptcy, the alleged invoices from Empaques
Poliplasticos, and the substantial transfers to Luna, insiders, affiliates, and various unidentified
parties in suspicious amounts.  The Debtor may argue that Valero and Gaudet are wholly insulated
from those issues; however, Valero and Gaudet are conflicted because they were both hired or
retained by Luna, and they have indicated that they intend to continue to work closely with Luna
as a consultant.  Moreover, Montes, the President of the Board of Zummit, will remain as the sole
Director of the Debtor, and Luna's mother is the 95% shareholder of the Debtor's parent.  It is
unfathomable that creditors or this Court could expect this management team, even as

reconfigured, to fulfill their fiduciary duties to the bankruptcy estate and its creditors and/or appropriately investigate these and other unknown transactions and transfers.

46.     Accordingly, more than ample "cause" exists, including fraud and gross mismanagement, for this Court to enter an order appointing a Chapter 11 trustee to take over the management of the Debtor's business and the assets of this bankruptcy estate.

### 2. The Appointment of a Chapter 11 Trustee is in the Best Interests of Creditors.

47.     Unlike Section 1104(a)(1),[9] under Section 1104(a)(2), the bankruptcy court generally performs a cost-benefit analysis to determine whether the appointment of a trustee would be in the interests of creditors, equity security holders, and other interests of the estate compared to the extra cost of a trustee to the estate. *See In re SunCruz Casinos, LLC*, 298 B.R. 821, 829 (Bankr. S.D. Fla. 2003). Importantly, "[w]hen a trustee is appointed 'in the interests of creditors,' it is *not* necessary to find that the debtor or *management engaged in any misdeeds*." *In re YC Atlanta Hotel, LLC*, 630 B.R. 348, 365 (Bankr. N.D. Ga. 2021) (emphasis added) (citation omitted). In balancing the cost and benefits of the appointment of a trustee under Section 1104(a)(2), bankruptcy courts should consider: "(1) the trustworthiness of the debtor; (2) the debtor in possession's past and present performance and prospects for the debtor's rehabilitation; (3) the confidence–or lack thereof–of the business community and of creditors in present management; and (4) the benefits derived by the appointment of a trustee balanced against the cost of the appointment." *Id.* at 370-71 (denying appointment of trustee under section 1104(a)(2) in what the court characterized as a "a very close question," notwithstanding questionable intercompany transfers, less than complete transparency, and a lack of creditor

---

[9]     A cost/benefit analysis is *not* required when appointment of a trustee is made pursuant to Section 1104(a)(1). Once cause is shown, a Chapter 11 trustee must be appointed, and it is not a relevant consideration whether the trustee will be successful. *SunCruz*, 298 B.R. at 832.

4856-4829-6627.v3

confidence, where the franchisor of debtor's hotel still supported management, the debtor had a 20-year track record of performance, debtor had shown cash and financial improvement since the bankruptcy filing, COVID restrictions had loosened, and management was willing to contribute funds to the business and had articulated a plan to pay creditors in full; but appointing examiner to provide additional oversight over financials and to scrutinize transfers); *In re 942 Penn RR, LLC*, 642 B.R. 89, 93 (Bankr. S.D. Fla. 2022) (appointing trustee under section 1104(a)(2) absent evidence of misdeeds by management where all creditors other than related parties supported appointment, debtor's owners had a conflict of interest due to asserted lien rights, and management was having a difficult time complying with bankruptcy requirements).

48.     Regardless of any misconduct, the Court should still appoint a trustee here because the appointment of a trustee is in the best interests of creditors and all parties in interest.  Given the allegations set forth in the Arizona Litigation and what has been unearthed thus far in the Zummit bankruptcy, issues with Empaques Poliplasticos (which relate to both the Debtor and Zummit), the admitted conduct of this Debtor to date, and Valero's and Gaudet's conflicts and ties to Luna, creditors and the business community simply cannot trust anything that Debtor's management team does or attempts to implement going forward or that they will diligently investigate and prosecute the Debtor's fraud.  Moreover, given that the Debtor is operating at a reduced capacity, allegedly does not even own some of its equipment, the fact that Line 4 does not appear to exist, and the monumental amount of secured debt owed to Movants, it is difficult to imagine how there is any real prospect of a reorganization.  Rather, it is almost inevitable that this Bankruptcy Case will result in a quick sale of what is left of the Debtor's property and likely years of forensic accounting and litigation, potential including cross-border litigation.  Given the known

4856-4829-6627.v3

transactions and conflicts discussed above, it is impossible to envision that Debtor's management team has the ability or moral authority to navigate those issues.

49.     While it is true that the appointment of a trustee will cause the Debtor's bankruptcy estate to incur additional professional fees, that expense should be partially if not entirely offset by the removal of Luna and Debtor's other managers and the expected savings caused by the cessation of their salaries (and in the case of Gaudet professional fees).   Thus, the benefit of removing Debtor's management team far outweighs the expense that will be incurred by the estate if a trustee is appointed.   Accordingly, for all of foregoing reasons, it is clearly in the best interests of creditors and all parties in interest in this Bankruptcy Case to appoint a Chapter 11 trustee.

WHEREFORE Movants respectfully requests that the Court: (i) grant this   Motion, (ii) enter an order pursuant to 11 U.S.C. § 1112(b) converting this Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Codee, (iii) in the alternative, enter an order pursuant to 11 U.S.C. §§ 1104(a) appointing a Chapter 11 Trustee to manage the Debtor's business and the assets in the Debtor's bankruptcy estate, and (iv) grant Movants any other relief that is just and proper.

4856-4829-6627.v3

This 2nd day of April, 2024.

Respectfully Submitted,


ARNALL GOLDEN GREGORY LLP

*/s/ Darryl S. Laddin*
Darryl S. Laddin
Georgia Bar No. 460793
Darryl.Laddin@agg.com
Sean Kulka
Georgia Bar. No. 648919
Sean.Kulka@agg.com
Jennifer L. Shelfer
Georgia Bar No. 557213
Jennifer.Shelfer@agg.com

*Attorneys for Truist Bank and Truist Equipment
Finance Corp.*

171 17th Street, N.W., Suite 2100
Atlanta, Georgia 30363-1031
404-873-7004


25